IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TUNG NGUYEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No.  08-1320 |
| v. ) | |
| ) | Magistrate Judge Lisa Pupo Lenihan |
| AK STEEL CORPORATION, ) | |
| ) | Doc. No.  20 |
| Defendant. ) | |
| ) | |
| ) | |

## OPINION

LENIHAN, M.J.

Currently before the Court for disposition is Defendant's Motion for Summary Judgment pursuant to FED.R.CIV.P. 56 and Western District of Pennsylvania Local Rule 56.1 (Doc. No. 20).  In this employment discrimination case, Plaintiff, Tung Nguyen, asserts he was terminated based on national origin discrimination, in violation of  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.,*  42 U.S.C. §1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §951 *et seq.,* by his former employer, AK Steel Corporation ("AK Steel" or "Company").  AK Steel moves for summary judgment in its favor on each of Plaintiff's discrimination claims on the basis that Plaintiff cannot establish either (1) a *prima facie* case of discrimination; or (2) proffer evidence sufficient to show that AK Steel's stated reasons for terminating his employment were a pretext for national origin discrimination.

For the reasons set forth below, the Court finds that material issues of fact exist precluding summary judgment.  Therefore, the Court will deny Defendant's Motion for Summary Judgment.

## I.    RELEVANT FACTS[1]

Plaintiff Tung Nguyen (hereinafter "Nguyen") was employed by Defendant AK Steel at a steel processing facility in Butler, Pennsylvania, known as the "Butler Works," until he was discharged on March 1, 2007.  The events leading up to his discharge can be summarized as follows.

In January 2007, Rick D. Winter ("Winter"), Manager of Human Resources at the Butler Works, was advised that a local scrap dealer possessed some brass that may belong to AK Steel. (Winter Dep. at 8-9.) Winter called Thomas R. Hasty ("Hasty"), AK Steel's Manager of Internal Auditing, and asked him to commence an investigation.  (*Id.* at 11-14.)  Subsequently, Hasty contacted the local scrap dealer, Greco Welding ("Greco"), and met with two of its employees to find out how Greco came to possess AK Steel's brass. (Winter Dep. at 11-12; Hasty Dep. at 26-28.) While at Greco, Hasty took custody of the material suspected to belong to AK Steel, and was also provided with a scrap ticket bearing Nguyen's signature, and license plate number. (Winter Dep. at 11-12; Hasty Dep. at 27-29.)   A Greco employee informed Hasty that the individual who sold the materials to Greco was "Asian, maybe Korean."  (Hasty Dep. at 28.)

After Hasty returned from Greco, he took the materials he obtained from Greco and compared them to parts in AK Steel's inventory.  Hasty was able to match certain brass to unique parts from the Company's inventory, and determined that some of the materials were unique to parts found on equipment in the Slab Conditioning Department, where Nguyen worked. (Winter Dep. at 12-14; Hasty Dep. at 29-32.)

On February 22, 2007, Nguyen was summoned to an investigatory meeting with Hasty, Charles David Kish ("Kish"), Section Manager of Operations at the Butler Works, Robert

---

[1]The facts will be viewed in a light most favorable to Plaintiff, and to the extent that any of the facts are disputed, the Court will note such dispute.

Newcombe from Labor Relations, and Bob Crawford, Nguyen's union representative. (Hasty Dep. at 32-33; Kish Dep. at 7-8; Pl.'s Dep. at 73,75.) At this meeting, Newcombe and Kish explained the purpose of the meeting was to determine facts and gather information regarding the alleged theft of Company property. (Hasty Dep. at 33.) They also encouraged Nguyen to answer their questions truthfully and cautioned him that the meeting could result in disciplinary action. (*Id.* at 33-34.) Hasty then proceeded to present to Nguyen new parts taken from the Company's storeroom, one at a time, and asked him if he was familiar with them, to which Nguyen responded in the affirmative. (*Id.* at 34.) Nguyen recognized the parts as ones he used every day in his job. (*Id.*)

Next, from a second box, Hasty presented to Nguyen, one at a time, the parts he obtained from Greco that corresponded to the new ones he had just shown to Nguyen. Nguyen stated he was familiar with them as they are the same ones he used in his job to do repairs. After he was shown several of the parts from Greco, Nguyen and his union representative requested and took a brief recess, after which the meeting resumed and Nguyen continued to identify the remaining parts in the second box. (Hasty Dep. at 34.)

Finally, from a third box of miscellaneous materials, Hasty began to ask Nguyen if he was familiar with the items in that box. (*Id*. at 34-35.) Nguyen recognized the box as one similar to a box he had in his garage. (*Id*. at 35.) Hasty then asked Nguyen if he had sold or taken the material in the third box to Greco's scrap yard, to which Nguyen replied, "no." Hasty next asked Nguyen if he had taken the material from AK Steel, to which Nguyen also replied, "no." Hasty then presented to Nguyen the scrap ticket and asked him to identify the signature, and Nguyen confirmed that it was his signature on the ticket. Hasty also asked Nguyen to identify the license plate number on the scrap ticket, but Nguyen could not remember his license

plate number. Hasty then asked Nguyen if he did not take the material from AK Steel and he did not sell it at Greco, to clarify how his signature ended up on the scrap ticket; Nguyen did not offer any explanation in response. (*Id.*)

Hasty repeated the same questions four or five times, and recounted Nguyen's responses as follows:

> [Nguyen] started to then tell me about being a good employee and how he liked to recycle and he did repair work, and if he had copper wire, he would throw it in the box and that's what that box was from. Over the course of the meeting, he then said, well, a [contractor] had been in the repair shop and done some repairs and the metal—some of the scrap had been laying on the floor for a couple of months. He then said that, well, he remembered he did sell some of the material, but he didn't remember where he sold it. Subsequently, he said that he bought a couple of pieces of brass from the [contractor] when they were doing the repair.

*Id*. at 35-36. Nguyen could not recall, however, either the name of the contractor who made the repairs or when the repair work was performed, when asked by Hasty. (*Id.* at 36.) Allegedly Nguyen also stated that the parts were left over from a repair and he bought a couple of pieces of scrap from the contractor for approximately $5.00. (*Id.*)

Neither Hasty nor Winter conducted any further investigation after the initial investigatory meeting on February 22, 2007. (Hasty Dep. at 37; Winter Dep. at 37.) Following the investigatory meeting, Nguyen received a letter from Kish, dated February 23, 2007, notifying Nguyen that he was being suspended beginning February 24, 2007, with intent to discharge effective March 1, 2007, as a result of his theft of Company property. (Pl.'s Dep. at 85-86; Pl.'s Ex. 16; Kish Dep. at 13.) Sometime after receiving this notice, Plaintiff told several co-workers in his department that he had taken the scrap material out of the plant. When his co-workers tried to reassure him, Nguyen responded, "I took the material. I didn't pay for anybody, that's stealing." (Pl.'s Dep. at 164.)

Generally, contractors are instructed to remove their scrap material from the plant; according to Hasty, "[t]hat's part of their contract. They are required to clean up their area, and as part of that, they may remove the scrap or they may not." (Arb. Hrg. Tr. at 50.) Documentation entitled "Butler Works – Contractors" indicates that the contractors involved in the crane work in Nguyen's department were not instructed on "disposition of waste and unused material." (Ex. 20, Pl.'s App. to Pl.'s Resp. Concise Stmt. Disputed Material Facts ("Pl.'s App."), ECF No. 32-4.) Moreover, both the 2002 and 2009 versions of the AK Steel Master Agreement provide that except as otherwise permitted by AK Steel, the contractor is required at the completion of the work to remove its tools, equipment, rubbish and surplus material and leave the work area clean and ready for use. With regard to salvable material, the master agreement specifically provides:

> Any scrap steel, iron or other salvable material resulting from the performance of any services or the supplying of any materials pursuant to an AKS purchase order or service order, or the cost of which is paid by AKS under and provision hereof, shall be the property of AKS. If such material is not paid for by AKS, it shall be the property of the Contractor and Contractor shall promptly, at its own expense, remove the same from AKS's property, unless otherwise agreed upon.

(Frisbee Dep., Exs. 7 & 9, ¶¶12, 14.) Although the Company maintains that the scrap brass left behind by the crane contractor was Company property,[2] there does not appear to be any documentary evidence to conclusively establish what the understanding was between the Company and crane contractor vis a vis ownership of the scrap brass at issue here.

Nguyen understood that AK Steel's policies prohibited the removal of any material from the facility without a supervisor-approved material pass, and although he had previously

---

[2] The scrap brass that Nguyen admitted to taking came from repairs done to the A-61 crane by contractor Simmers Crane in 2006. (Frisbee Dep. at 53, 56-57.)

obtained a material pass to remove waste wood from the Company's facility, Nguyen did not obtain a material pass when he removed the scrap brass at issue here. (Pl.'s Dep. at 29-31.) Nguyen proffered the following explanation for failing to get a material pass to remove the scrap brass:

> Q. Did you ask Mr. Schmidt for a material pass to remove this material?
> A. No.
> Q. Why not?
> A. It's laying there for a long time. Finally, somebody have to clean it up. And I clean up, and it at the end of the day I didn't want to wait to go through the problem—probably laziness to go through the problem of getting paperwork done. I just took it.
> Q. Did you think he wouldn't give you the material pass?
> A. I didn't even think of that at that time.

(Pl.'s Dep. at 84.) In addition, Nguyen acknowledged that he received and read copies of the various safety and security handbooks of AK Steel and its predecessor. (Pl.'s Dep. at 33-35; Pl.'s Dep. Ex. 5 & 6.) He understood that AK Steel's rules and policies prohibit theft and applied regardless of whether the property belonged to the Company, a contractor or co-worker. (Pl.'s Dep. at 32, 39-42.) Nguyen also understood that employees who violated those standards would be "punished." (Pl.'s Dep. at 32, 39.)

After Nguyen received notice that he had been suspended with intent to discharge, the union invoked the appeal process set forth in the Company's collective bargaining agreement. (Pl.'s Dep. at 87; Pl.'s Dep. Ex. 17; Affidavit of Michael C. Seyler dated 8/31/09 ("Seyler Aff."), ¶¶6-14.) In response, a works management hearing was held on March 8, 2007, and was conducted by Harry Harris, a senior labor relations representative at the time. (Pl.'s Dep. at 87-88; Pl.'s Dep. Ex. 17; Harris Dep. at 6.) At the works management hearing, the Company contends that Nguyen admitted to stealing *Company* property, but Nguyen disputes making any

such admission. Rather, Nguyen submits that he admitted only to taking the scrap, not that it belonged to the Company. (Pl.'s Dep. Ex. 17; Kish Dep. at 14-15; Harris Dep. at 11, 30-31; Harris Dep. Ex. 1.) Also, during the works management hearing, the Union proffered the following explanation on Nguyen's behalf:

> [Nguyen] w[as] very scared at the investigatory meeting when we looked through two boxes of scrap material and that is why [Nguyen] claimed [he] knew nothing of this matter except that [he]identified a few pieces of scrap [he] said [he] purchased from a contractor. . . . the Union explained that [Nguyen] said this because [he] had not been in any previous trouble, but now after a review of the situation [he] admitted stealing the subject scrap. The Union added that [Nguyen] take[s] recycling very seriously, and because the scrap had been lying on the floor for over two months, this motivated [him] to do something that [he] felt was aiding the environment. In support of this, the Union gave an example that [Nguyen] had built a bin for recycling cardboard in [his] department. The Union also pointed to [his] twelve years of service without a blemish on [his] record. Additionally, [Nguyen] added that [he was] very embarrassed and remorseful after the incident. In summary, the Union argued that [Nguyen] had made an error in judgement (sic) and that the discharge was not appropriate and [Nguyen] should be returned to work.

(Pl.'s Dep. Ex. 17.) At the conclusion of the works management hearing, Harris affirmed the Company's decision to discharge Nguyen, reasoning that the evidence now showed that there was no dispute that Nguyen stole the scrap at issue. (Pl.'s Dep. at 90; Pl.'s Dep. Ex. 17; Harris Dep. at 30.)

The Union then filed a grievance challenging Nguyen's discharge. (Pl.'s Dep. at 99; Pl.'s Dep. Ex. 18.) Consequently, on May 2, 2007, a Step III hearing was conducted by Michael Seyler, a senior labor relations representative, to review Nguyen's discharge. (Pl.'s Dep. at 104; Pl.'s Dep. Ex. 19.) AK Steel contends that at the Step III hearing, Nguyen admitted that he stole *Company* property, but Nguyen disputes making any such admission. The record evidence cited by the parties shows that Nguyen admitted only that he took the scrap, not that it belonged to the

Company. (Pl.'s Dep. at 107-08; Pl.'s Dep. Ex. 19, Pl.'s App. Tab N, ECF No. 25-1; Affidavit of Robert L. Crawford dated 9/30/09 ("Crawford Aff."), ¶¶2-5; Affidavit of Donna Weckerly dated 9/30/09 ("Weckerly Aff."), ¶¶3-7.) In addition, at the Step III hearing, the Union advanced the argument on Nguyen's behalf that his motivation for taking the scrap was not to make a profit, but to maintain a clean environment and reduce waste by recycling scrap materials left behind on the department floor by a crane contractor for over two months. (Pl.'s Dep. Ex. 19.) The Union further submitted that Nguyen, having been raised in the poverty-stricken county of Vietnam, learned not to be wasteful, and was bothered by the thought that the abandoned scrap would be thrown out and wasted. The Union asked that the Company also take into consideration Nguyen's blemish-free employment record and his contributions to the Company during his twelve years of employment, as well as his contributions of time and money to various eleemosynary organizations. The Union also presented two letters of support and a petition from co-workers on Nguyen's behalf. (*Id.*)

Nguyen apologized for his actions, and stated that "he knew he was wrong and that he took full responsibility for his actions that were more stupidity than malice." (Pl.'s Dep. Ex. 19, p. 2.) After hearing all of the arguments and reviewing the record evidence, Seyler affirmed the Company's decision to discharge Nguyen. (Pl.'s Dep. at 99; Pl.'s Dep. Ex. 19; Seyler Dep. at 25-26.)

In denying the grievance, Seyler offered the following explanation:

> The problem, however, with the Union's defense is the grievant's act of theft and the grievant's initial denial that he stole anything have irreparably breached the trust relationship with this employer. There are rule violations that employees commit for which it is appropriate to apply warnings and suspensions as corrective actions to change behavior. There are also those fundamental policy violations that destroy the employment relationship. The grievant committed one of the latter offenses. A breach of this

magnitude against Company interests has erased the impact of the grievant's good attitude and good work.

(Pl.'s Dep. Ex. 19, p. 3.)

Next, Nguyen appealed the decision denying his grievance to arbitration. Prior to the arbitration hearing, Brian Cossitor, Vice-President of the Union,[3] discussed with Winter the possibility of a "last chance agreement" for Nguyen on several occasions. (Cossitor Dep. at 17.) A "last chance agreement" is a matter of managerial discretion. (Seyler Dep. at 59.) Cossitor recalls that Winter remarked, "I'm between a rock and a hard place. … I'm not worried about Tung. … I'm worried about the 1400 other people. … [P]erfect example. … [I]f Brian Cossitor steals something and … we bring you back and … somebody sees you, they are going to say, hey, there is Brian Cossitor. He stole something and got back to work."[4] (Cossitor Dep. at 17-18.) In response to the question, "so what made you think that this comment that if you, Brian Cossitor, stole something and were put back to work, everyone would notice, what made you think that related to Mr. Nguyen's national origin[,]" Cossitor replied:

> I am very well known. Whenever we had the apprenticeship program, it's called a roving program, and I roved every shop, every maintenance department. Basically, I was everywhere, knew everybody that worked there at that time, was into every department, and I'm very – at that time, I had a ten-inch goatee at different times. I'm kind of colorful, so everybody knows me, knows of me. I'm not a wallflower, I guess.
> And that's what I took it to mean, that you're visible, everybody knows you, knows you by name. If they see you back, they are going to know, and that's what I took it, because of Tung, he definitely looks different, he talks different, he speaks in broken English, and that's the way I took that statement. I thought it was

[3] Cossitor took over the defense of Nguyen's discharge upon his election to the position of Vice-President of the Union in April 2007. (Affidavit of Brian D. Cossitor dated 9/16/09 ("Cossitor Aff."), ¶¶ 1-2.)

[4] Similarly, Nguyen claims that Cossitor relayed to him Winter's remarks comparing Nguyen "to a Vice President of the Union, that everybody at work knew who I was, that I stood out, not just a face in the crowd, … if he lets me go back to work, people will instantly recognize that I was granted my job back." (Pl.'s Ans. to Interrogs., No. 14.)

important enough that I called Jack and told Jack what happened, and Jack said, make sure you document the event.

(Cossitor Dep. at 18-19.) Cossitor admitted that during this discussion with Winter regarding a last chance agreement, Winter never expressly referred to Nguyen's national origin or any characteristics that could be associated with Nguyen's national origin. (Cossitor Dep. at 19.) Cossitor also admitted that certain offenses, including theft, which result in discharge, "definitely . . . carry more weight as far as stigma," and employees are more likely to discuss the situation. (Cossitor Dep. at 20-21.)

Subsequently, on July 10, 2007, an arbitration hearing was held, at which Nguyen testified on direct examination as follows:

> Q. Where did this brass come from?
> A. In the middle of [2006], we have an outside contractor come in and – come in and work on our, one of our overhead crane on the west end of opposite building. We rarely work that area. And they were throwing stuff down on the ground. There was so many boxes there, and all pieces of equipment in that end beside the walkway.
> . . .
> And I asked them, what are you guys doing? At one time they come in and ask for water and coffee, and we BS'ing, and they say if the company we work for asking for it, we give to them. If they don't ask for it, we use, collect them and sell for our pocket money. Do you want it? We will probably take it out here because they didn't ask for it, nobody asked for it. Do you want it? We can sell it to you. We stay over at the Days Inn. I said no. It didn't seem right at that time.
> Q. So they offered to take the scrap out and sell it to you – or sell it to you and take it out and give it to you?
> A. Yes, sir. Yes, sir. They're already going to take it out.
> Q. But you said no?
> A. Correct.
> Q. So you didn't pay them any money?
> A. No, I did not.
> Q. Okay. So what happened? The contractor was there. Did the contractor leave?

A.    I believe they – Yes.  I believe they were working late.  They run into some problem.  They work like 20 straight hours.  And so they didn't pick it up.  It just laid there.

Q.    And how long did it lay there?

A.    From the middle of the – From – It's rather hot.  It was hot when you're working on it, so it had to be summertime.  And it laid there till it was freezing cold.

Q.    So from last summer?

A.    Yes.

Q.    Okay.  And when the brass was lying there.  Did anybody pick it up?

A.    No.  nobody have time.  We don't work in that area.  We just walk by there.

Q.    You walk by there?

A.    Yeah.

Q.    So what happened?  How did it get out of the plant?
. . .

A.    [L]ast fall, my boss, Bill Schmidt, said that we are going to put more baker in that area of building because we need it.  . . .  And then it hit me, because I said, holy heck, the brass there, throw it out there from the contractor, they didn't pick it up because you were late.  Nobody want to do something that create more work for the other guy.

        Here, I'm making excuse for myself.  I said, holy heck, they will take the gravel coming in here and dump it, cover them up.  I make an excuse for myself.  One day, one night I saw a box, paper box.  I pick it up, throw some of the brass in there, put it in a bag, and take it out here.  I steal it.

Q.    You stole it?

A.    I make excuse for myself.  Oh, it will lay there.  Soon they will cover it.  It will lay there for the next hundred years.  If somebody pick up, throw it in scrap, it become a waste product.  Actually, it's become a slag.

Q.    Slag?

A.    Yeah.  That's like a gravel.

Q.    So what did you do when you took it out? Where did you go with it?

A.    I took it home.  And it hit me.  I says it's stealing.

Q.    It hit you when you got home?

A.    So, well, when I pick it up, I make all kind of excuse for myself, something good.  I should of take it, recycling it.  Instead of waste it, on the ground, which would be happen.  But still, when I get home, I realize it's wrong.

Q.    So what did you do?

A.    I hid it.

Q.    Where?

> A. In my garage. . . .
>
> Q. Did you take it out of your garage eventually?
>
> A. I think after the holiday, my wife nagging me about cleaning up that end of the garage, and one week she said, "If you don't clean it, I'm going to clean it." And that scared the heck out of me. I said, holy heck, she will see that.
>
> And one day she wasn't home, she was working, and I hurry up and throw that in, and I have a ol[d] case, boxes. I throw scrap copper away. I working outside of my house, volunteer work, and any scrap, copper, wire, I throw in there. I take that with me also and take it to Greco, and sell it.
>
> Q. Okay. So you took brass that you took out of the plant?
>
> A. Yes.
>
> Q. And copper that you had from outside?
>
> A. Yes.

(Pl.'s Dep. Ex. 21, pp. 118-124.) Later, on cross examination, Nguyen testified:

> Q. . . . Mr. Nguyen, you admit that you stole from AK Steel?
>
> A. Yes, I did.
>
> Q. And you admit that you lied in that initial investigation meeting with Mr. Hasty?
>
> A. Yes, I did.
>
> Q. Okay. And the material that you took was AK property, isn't that right?
>
> A. Yes, I did. Yes, it is.
>
> Q. It was AK property?
>
> A. Yes, it was AK property, yeah.

(Pl.'s Dep. Ex. 21, p. 131.) Nguyen's admission on cross-examination at the arbitration hearing was the first time he admitted stealing Company property. (Weckerly Aff., ¶¶3-6; Crawford Aff., ¶¶ 3 & 5; Cossitor Aff., ¶¶ 6-7.) The arbitrator, Helen Witt, subsequently upheld the decision to discharge Nguyen. (Pl.'s Dep. at 114.)

After the arbitration hearing but before the arbitrator issued her decision, W.H. Leyland, then President of the Union, requested Winter to give Nguyen a last chance agreement. When Winter refused, Leyland indicated that an EEOC charge of discrimination based on national origin would be forthcoming. (Affidavit of W.H. Leyland dated 9/30/09 ("Leyland Aff."), ¶ 10.)

On or about July 2, 2007, Nguyen filed a charge of discrimination based on national

origin (Vietnamese) with the Equal Employment Opportunity Commission (EEOC), and requested dual filing with the Pennsylvania Human Relations Commission. The EEOC issued a "Right to Sue" letter on or about July 7, 2008.

Subsequently, on September 22, 2008, Nguyen timely instituted the present action alleging that his employment was terminated because of his national origin, and that AK Steel denied him an equal opportunity to continue and advance in his employment on the same terms and conditions as comparably situated native-born American employees, and therefore unlawful pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991; and the Pennsylvania Human Relations Act, 43 P.S. § 955.

### Factual Allegations Regarding Discriminatory Intent and/or Pretext

Nguyen believes that he was discriminated against because he was born in Vietnam. (Pl.'s Dep. at 116.)  Mr. Schmidt, who supervised Nguyen during his entire time in the slab grinding department, knew that Nguyen had been born in Vietnam and said it "was fairly common knowledge"; he did not know if Nguyen was an American citizen.  (Schmidt Dep. at 6, 17.)

In or around 1996, one to two months after Nguyen starting working in the slab conditioning department, graffiti appeared on a wall approximately 10 to 15 feet from the leader's shanty, that read, "Cat, the other white meat."  (Pl.'s Dep. at 50-51.)  The location of the graffiti was such that workers in his department and his supervisor, Mr. Schmidt, walked by it every day when they gathered in the leader's office to get their daily work assignments.  (Pl.'s Dep. at 50-51, 144.)  Indeed, Mr. Schmidt admitted seeing this graffiti before it had been covered over by the Company, and had no idea how long it had been on the wall before it was covered

over.  (Schmidt Dep. at 12-13, 44.)  However, this particular graffiti was still present at the time Nguyen was terminated.  (Pl.'s Dep. at 50.)

Similar graffiti referring to Asians, such as "hot dog, 5 cent; cat, 10 cent," "fish head eater," and "slanted eyes," appeared on six or seven baker (equipment) covers in his department, which has since been painted over.  (Pl.'s Dep. at 51, 145.)  Nguyen further stated that on at least three occasions between 1996 and 1999, co-workers duct-taped hand-made posters to his locker which contained something degrading individuals of Vietnamese or Asian descent.  (Pl.'s Dep. at 146-48.)  Nguyen voiced his objection to these posters to his union representative at the time, Bob Crawford, as opposed to reporting the incidents to his supervisor, because he was new in the department and he did not want to create any problems.  (Pl.'s Dep. at 52, 146, 148.)  Crawford told Nguyen not to report the incidents to his supervisor, as doing so would result in an investigation and they would get behind in their work.  Instead, Crawford told Nguyen that he would talk to everyone in the department.  (Pl.'s Dep. at 146.)  On another occasion, someone marked up a soup can with the words "cat meat soup" in big black letters, and left it on the table in the lunchroom for Nguyen to see.  (Pl.'s Dep. at 147.)

According to Harry Harris, labor relations employees make graffiti patrols of AK Steel's facility.  (Harris Dep. at 47-49.)  Harris observed graffiti in the Company's facility, some of which contained ethnic or racial comments, which he covered and reported to Winter.  (Harris Dep. at 47-49.)  However, Harris did not go into the slab conditioning department where Nguyen worked.  (*Id.* at 49.)  Winter, the Human Resources Manager at the Butler facility, acknowledged the Company's obligation to remove such graffiti.  (Winter Dep. at 82.)

Although Nguyen knew that the Company's policies prohibit discrimination, harassment, and retaliation for reporting such conduct, and require employees to report potential EEO

violations and harassment, he never reported to management any conduct that he deemed discriminatory or harassing. (Pl.'s Dep. at 39-42, 46-47, 49, 54-58, 60-67; Pl.'s Dep. Exs. 10-15.) It appears, however, that the reason Nguyen did not report these incidents is because his Union co-workers and at least one Union official (Crawford) allegedly discouraged him from reporting anything that he perceived to be discrimination or harassment by telling him that employees who make such reports are "troublemakers." (Pl. Dep. at 44-49; 52, 148.) Nguyen admits that no management level employee ever discouraged him from making such reports. (Pl.'s Dep. at 44.)

Nguyen also asserts that native-born American employees who were similarly situated to him received lesser discipline for similar conduct. Besides Nguyen, there have been forty (40) other incidents in which a Butler Works bargaining unit employee was disciplined for misconduct that involved, in any way, taking or obtaining anything that an employee was not entitled to take or receive. (Seyler Aff., ¶¶15, 17.) The national origin of these 40 employees is United States. (*Id.* at ¶16.) Nguyen claims that four of his co-workers stole "thousands and thousands of dollars from the [C]ompany," but were not discharged. (Pl.'s Dep. at 101.)

Of the 41 incidents involving employee discipline for misconduct listed in Exhibit A to Mr. Seyler's affidavit, AK Steel asserts that only nine of the incidents involved situations where employees were disciplined for "theft" or "stealing." (Seyler Aff., ¶17 & Ex. A attached thereto.) Nguyen disputes the Company's contention that only nine of the 41 incidents constituted theft or stealing, and submits that although the Company chose not to use the terms "stealing" or "theft" in the descriptions of the incidents contained in Exhibit A, all such cases constituted violations of the Company's Asset Protection Policy. (Pl.'s Resp. Concise Stmt. Disputed Material Facts ("Pl.'s Resp. CSDMF"), ¶58, ECF No. 31.)

The Company's *Safety and Security Handbook* sets forth unsafe and improper behavior which will subject an employee to disciplinary action up to and including discharge. Included in the list of improper conduct is stealing, which is defined as the commission of any of the following acts:

(a)    Any action contrary to the company *Asset Protection Policy.*

(b)    Unauthorized possession of property of the company or of another employee/contractor.

(c)    Punching of another's time card.

(d)    Falsifying records or reports.

(e)    Releasing proprietary or confidential information.

(f)    Misuse of material passes.

(g)    Personal work using company material or equipment.

(*Refer to the Asset Protection Policy*)

(Ex. 1 to Dep. of Bennett L. Frisbee at 76-77, Jt. App. of Conf. Docs. Filed Under Seal ("J.A."), Tab 3, ECF No. 41.) The Company's Asset Protection Policy is also set forth in the *Safety and Security Handbook* and provides, in relevant part:

> Breaches of honesty, theft or attempted theft of funds or property belonging to the Company is a violation of Company Policy. Property includes, but is not limited to: . . . scrap, . . . wages fraudulently secured, . . . employee health and welfare benefits, . . ..
>
> Employees who violate this Policy are subject to disciplinary action up to and including discharge. . . .

(*Id.* at 82-83.)

Nguyen's supervisor, Schmidt, stated that under the Policy, theft of time and falsifying of records is considered to be "stealing." (Schmidt Dep. at 38.) Schmidt further stated that the Company Policy is very clear "that theft of material, time, theft of anything is strictly prohibited and is clearly punishable by discipline and including discharge." (*Id.* at 36.) Seyler, a senior labor relations representative, stated "theft is theft," "stealing is stealing," and a "falsehood is a

16

falsehood." (Seyler Dep. at 55-58.) According to Seyler, "theft is normally dischargeable," but the discipline is based on the facts of each case. (*Id*. at 27, 53.)

The parties also dispute the nature of the evidence that existed at the time the Company imposed discipline on employees accused of theft of time and on those accused of fraudulently obtaining insurance benefits for spouses. AK Steel asserts that it had conclusive evidence of theft in only two of the nine cases identified by the Company as theft cases, both of which involved theft of tangible property, as opposed to theft of time: Nguyen, who confessed to stealing AK Steel's scrap metal; and "RC" (1491900),[5] who stole another employee's wallet and was caught on video surveillance using a stolen credit card. In both cases, the employees were discharged. (Def.'s Stmt. Undisputed Material Facts ("Def.'s SUMF"), ¶ 59, ECF No. 23.)

Of the seven theft of time incidents, it is undisputed that AK Steel possessed circumstantial evidence that all seven employees[6] intentionally obtained pay for time not worked. (Seyler Aff., ¶19.) Of these seven employees, three ("RD", "MT", and "MK") denied that they knowingly obtained pay for time not worked, but AK Steel determined that the circumstantial evidence demonstrated that they intentionally stole time. Consequently, "RD", "MT", and "MK" were discharged. (Seyler Aff., ¶20.) As to the remaining four employees, "JM-1," "RM", "JB", and "JM-2," who also denied knowingly obtaining pay for time not worked, AK Steel submits that it eventually determined that the evidence did not exist to prove that these employees intentionally stole time, and thus, mitigated the discipline imposed on these four employees. (Def.'s SUMF, ¶ 62 (citing Seyler Aff., ¶21 & Ex. A thereto).)

---

[5] To protect the identity of these other employees, they are referenced throughout the parties' papers and in this opinion by initials and employee number.

[6] The seven employees accused of obtaining pay for time not worked (hereinafter referred to as "theft of time"), are RD (#1540300), MT (#1537400), MK (#1539400), JM-1 (#1447500), RM (#1507508), JB (#1545700), and JM-2 (#1919400).

Nguyen disputes that the Company did not have conclusive evidence of theft when it imposed the mitigated discipline on "JM-1," "RM", "JB", and "JM-2, and points to the Company's own contemporaneous documents as support. (Pl.'s Resp. CSDMF, ¶¶ 59, 62, 110-113, 116-119 (citing Affidavit of Keith Hobaugh dated 9/28/09 ("Hobaugh Aff."), ¶¶12-14 & Ex. A thereto; Harris Dep. at 35-36, 41).) Indeed, this evidence shows that Harry Harris found at the works management hearings that JM-2 and JB knowingly received improper payments after their supervisor found their explanations to be "simply not credible" and believed that both men lied. (Harris Dep. at 35; Hobaugh Aff., Ex. A.) The evidence further shows that at the works management hearings for RM and JM-1, Harris found that both employees submitted false reports and gave explanations that were "simply not credible" and "incredible," respectively, and believed that RM lied. (Harris Dep. at 36; Hobaugh Aff., Ex. A.) In addition, Schmidt, who also supervised JM-1, JB, RM, and JM-2, recommended the discharge of JM-2, JB, and RM for "theft of overtime pay" because "they knew what they were doing and knew that they should not do that." (Schmidt Dep. at 25-27.)

In another fourteen of the misconduct incidents listed in Exhibit A to Seyler's affidavit, employees were disciplined for fraudulently obtaining health insurance benefits. (Seyler Aff., ¶ 22 & Ex. A thereto.) AK Steel contends that the employees in those incidents denied that they knowingly obtained benefits to which they were not entitled, and it eventually determined that the evidence did not exist to prove that these employees intentionally defrauded the Company. (Def.'s SUMF, ¶64 (citing Seyler Aff., ¶23 & Ex. A thereto).) Consequently, AK Steel mitigated the discipline imposed on those employees by entering into last chance agreements. (Id.; Seyler Dep. at 64-65.) Nguyen contends, on the other hand, that the Company represented to the Union that it had conclusive evidence based upon the employees' admitted signatures on

documents prepared by them and after verification of the employees' spouses' eligibility for insurance with the spouses' employers that these employees had fraudulently obtained health insurance from the Company. (Pl.'s Resp. CSDMF, ¶ 64 (citing Affidavit of James Gallagher dated 9/30/09 ("Gallagher Aff."), ¶¶ 7-10; Affidavit of James Ihlenfeld dated 9/25/09 ("Ihlenfeld Aff."), ¶¶4-10).)

Further review/investigation was conducted in the insurance benefit fraud cases (Gallagher Aff., ¶¶7-13), and in the cases involving other slab conditioning employees (Hobaugh Aff., ¶¶12-14, 19). However, the Company did not conduct further review in Nguyen's case, i.e., did not attempt to examine the crane contractor, but rather, assumed, without conclusive evidence, that the scrap belonged to the Company (Testimony of Seyler, Harris & Hasty, Arb. Hrg. Tr. at 25-26, 54), as opposed to a contractor.

AK Steel submits that in the remaining 18 disciplinary incidents for employee misconduct listed on Exhibit A to Mr. Seyler's affidavit, none of those incidents involved theft. (Def.'s SUMF, ¶ 65 (citing Seyler Aff., ¶24 & Ex. A thereto).) Nguyen disputes this allegation, contending that all such incidents involved violations of the same corporate Asset Protection Policy as contained in the aforementioned *Safety and Security Handbook*. (Pl.'s Resp. CSDMF, ¶65.) Although Nguyen admits that he had no personal knowledge outside of this case as to whether any of the employees disciplined in the other 40 incidents admitted that they stole from the Company (Pl.'s Dep. at 122-130), evidence gathered in the litigation of this case indicates that the Company did and does have such evidence. (Pl.'s Resp. CSDMF, ¶67 (citing Ihlenfeld Aff., ¶¶ 4-15; Gallagher Aff., ¶¶ 7-10; Hobaugh Aff., ¶¶ 12-14).)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED.R.CIV.P. 56(e)) (emphasis added by *Matsushita* Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    DISCUSSION

Nguyen's national origin discrimination claims are scrutinized under the familiar burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[7]  Initially, the plaintiff bears the burden of establishing a *prima facie* case by demonstrating that (1) he is a member of a protected class, (2) he is qualified for the position, (3) he suffered an adverse

---

[7] In addition to his Title VII claim, Nguyen also asserts violations of 42 U.S.C. § 1981 and the Pennsylvania Human Relations Act, 43 PA. STAT. ANN.. § 955(a). Because the latter two claims involve the same elements of proof as the Title VII claim, the same legal analysis applies to those claims as well.  *Johnson v. St. Luke's Hosp.,* 307 F. App'x 670, 671 n.1 (3d Cir. 2009) (citing *Lewis v. Univ. of Pittsburgh,* 725 F.2d 910, 915 n. 5 (3d Cir. 1983)).

employment action, and (4) members outside the protected class were treated more favorably. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999). The question of whether a plaintiff has established his *prima facie* case is a question of law to be determined by the court. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003). If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802). Once the employer carries its burden, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were not the true reasons, but were merely a pretext for discrimination. *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

In support of its motion for summary judgment, AK Steel initially argues that Nguyen has failed to establish a *prima facie* case of discrimination based on national origin under the *McDonnell-Douglas* burden-shifting test. Moreover, even if Nguyen is able to establish a *prima facie* case of discrimination, AK Steel submits that it has articulated legitimate non-discriminatory reasons for terminating Nguyen, and that Nguyen has failed to demonstrate its reasons are pretextual. The Court will address each of these arguments *seriatim*.

### A. Plaintiff's *Prima Facie* Case

#### 1. Disparate Treatment

It is undisputed that Nguyen has satisfied three of four elements of a *prima facie* case of national origin discrimination. First, Nguyen was born in Vietnam, and thus, is a member of a protected class. Second, Nguyen was qualified for the position he previously held at the AK Steel facility in Butler, Pennsylvania, at the time of his discharge. Third, Nguyen was suspended

on February 24, 2007, and discharged effective March 1, 2007, and thus, suffered an adverse employment action. However, the parties dispute whether Nguyen has satisfied the fourth element.

In order to satisfy the fourth element of his *prima facie* case of national origin discrimination, Nguyen must show that similarly situated native-born American employees were treated more favorably than he. *Sarullo,* 352 F.3d at 798 (citing *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 352 (3d Cir. 1999); *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15 (1977)). The native-born American employees will be deemed similarly situated if Nguyen demonstrates that their "acts were of 'comparable seriousness' to his own infraction." *See Crumpton v. Potter,* 305 F.Supp.2d 465, 472 (E.D.Pa. 2004) (citing *Anderson v. Haverford College,* 868 F.Supp. 741, 745 (E.D.Pa. 1994) (quoting *Linear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir. 1988)). In the context of a discriminatory discipline claim, the district courts in this circuit have expounded on this test:

> "In order for employees to be deemed similarly situated, it has been determined that the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Ogden v. Keystone Residence,* 226 F.Supp. 2d 588, 603 (M.D.Pa. 2002) (quoting *Morris v. G.E. Fin. Assurance Holdings,* No. 00-3849, 2001 WL 1558039, at *6 (E.D.Pa. Dec. 3, 2001)); *Tyler v. SEPTA,* No. Civ. A. 99-4825, 2002 WL 31965896, at * 3 (E.D.Pa. Nov. 8, 2002), *aff'd without op.* 85 F. App'x 875 (3d Cir. 2003) (to show that a particular employee is similarly situated, the employee's acts must be of comparable seriousness to plaintiff's own infraction, and engaged in the same conduct without such differentiating or mitigating circumstances); *Anderson,* 868

F.Supp. at 745 (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992))(same); *see also Bullock v. Children's Hosp. of Philadelphia,* 71 F.Supp. 2d 482, 489 (E.D. Pa. 1999). A plaintiff's burden at the *prima facie* stage of the analysis is not onerous, but is based upon a few generalized factors. *Simpson v. Kay Jewelers,* 142 F.3d 639, 646 (3d Cir. 1998) (citing *Burdine,* 450 U.S. at 253; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 516 (1993); *see also Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1214 n. 1 (3d. Cir. 1988) (stating that the *prima facie* case is rarely the focus of the ultimate disagreement because it is easily made out).

.        Nguyen submits that he has met the fourth element of his prima facie case by presenting evidence that similarly situated employees, who were also accused of theft (albeit theft of time and fraudulently obtaining insurance benefits to which they were not entitled) and were not members of the protected class, were offered mitigated discipline, and therefore, were treated more favorably than he. In support, Nguyen relies on the decision of the United States Court of Appeals for the Seventh Circuit in *Peirick v. Indiana University-Perdue University Indianapolis Athletics Department,* which provided the following test for determining whether comparators are similarly situated:

> To assess whether two employees are similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000). "[I]n disciplinary cases-in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason-a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Id.* (internal citations omitted). Typically this involves showing that the employees shared the same supervisor, performance standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18. That said, "[o]ur similarly situated requirement 'should not be applied mechanically or inflexibly.' " *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d

781, 791 (7th Cir. 2007) (quoting *Hull v. Stoughton Trailers, LLC*,
445 F.3d 949, 952 (7th Cir. 2006)).

510 F.3d 681, 688 (7th Cir. 2007).

Based on this test, Nguyen identifies eighteen other employees who were accused of theft

but, unlike him, were not discharged.  Fourteen of these employees were accused of fraudulently

obtaining insurance benefits and the other four were accused of theft of time.  Nguyen submits

that in all nineteen cases, the misconducts with which they were charged constituted "stealing"

as defined by the Company in its Handbook.  Nguyen further submits that the same labor

relations personnel/managers reviewed all 19 cases, and Rick Winter, the Human Resources

Manager at Butler Works, was involved in the determination of disciplinary action taken in all 19

cases; in four of these cases, the employees had the same direct supervisor (Schmidt) as Nguyen.

Nguyen also submits that Seyler, one of the labor relations representatives who reviewed the

cases, viewed the misconduct in those cases to be the same, based on his statement, "theft is

theft, stealing is stealing, and a falsehood is a falsehood."  In the other 18 cases, all of the

employees are native-born Americans.  Nguyen contends these facts are sufficient to establish

the fourth prong of his *prima facie* case, based on Third Circuit precedent such as *Pivirotto,* 191

F.3d at 352-54 (proof needed to establish the fourth prong varies depending on the

circumstances, and the facts are not to be examined in a rigid or mechanistic fashion).[8]

In response, the Company disputes that the alleged comparators are similarly situated to

Nguyen.  AK Steel submits that Nguyen's list of putative comparators is over-inclusive to the

---

[8] Nguyen further argues that to the extent AK Steel contends substantial differences exist between him and the other
18 employees whose discharges were approved by Seyler and Winter, those alleged differences require an
assessment of the credibility of the asserted distinctions, which is not appropriate at the summary judgment stage,
citing in support *Marino v. Industrial Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for
summary judgment, a district court may not make credibility determinations or engage in any weighing of the
evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in
his favor.'") (quoting *Anderson,* 477 U.S. at 255).

extent it includes employees who were implicated in misconduct that is not identical to Nguyen's misconduct. According to AK Steel, Nguyen is in a class of one insofar as he is the only employee who stole and resold Company property, lied about the incident, and then made a full confession leaving no question as to his culpability. In contrast, the putative comparators, whose misconduct consisted of either theft of time or fraudulently obtaining insurance benefits, plausibly denied that they knowingly obtained pay or benefits to which they were not entitled, and therefore, according to AK Steel, the incidents involved different misconduct and dramatically less proof of culpability. AK Steel further argues that Nguyen's list of putative comparators is under-inclusive to the extent that it ignores the fact that the Company discharged four other employees for theft, which evidence eviscerates Nguyen's disparate treatment claim.

In support of its argument, AK Steel initially submits that Nguyen cannot satisfy the exacting requirements for proving that he is similarly situated to any of his putative comparators. According to AK Steel, these requirements include showing that his comparators are similar "in all relevant respects[,]" *Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir. 1997), and that the "quantity and quality of the comparator's misconduct [is] nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges[,]" *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999).[9] Indeed, AK Steel contends that an employer may treat employees differently who do not engage in the exact same act, even if they

---

[9] The Eleventh Circuit's "nearly identical" misconduct requirement was called into question by a subsequent panel decision in *Alexander v. Fulton County, Georgia,* which held that the law requires only "similar" misconduct from the similarly situated comparators. 207 F.3d 1303, 1334 (11th Cir. 2000). However, in *Bush-Fowler v. Orange County, Florida,* the court of appeals noted the disagreement between the panel decisions and held it was bound to follow the "nearly identical" standard enunciated in *Maniccia* because when a later panel decision contradicts an earlier one, the earlier panel decision governs. 447 F.3d 1319, 1323 n. 2 (11th Cir. 2006) (citation omitted). Thus, there appears to be some disagreement as to whether the "nearly identical" standard should be the proper benchmark in the Eleventh Circuit.

violate the same general policies.[10]  Thus, AK Steel maintains that because none of the other alleged comparators whose discipline was mitigated engaged in the exact same conduct as Nguyen, they are not valid comparators. The Court does not agree with such a rigid interpretation of the standard.

It is important to note that at the *prima facie* stage of the analysis, the Court is not required to engage in a fact specific finding to determine whether a comparator is similarly situated to Plaintiff. *Brooks v. USX Corp.,* No. Civ. A. 05-47, 2006 WL 2547342, at *5 (W.D.Pa. Aug. 31, 2006). Rather, all that is required at this stage is an inquiry based on a few generalized factors. *Id.* (citing *Simpson,* 142 F.3d at 646); *see also Burdine*, 450 U.S. at 253; *Hicks,* 509 U.S. at 516.

Applying this standard to the case at bar, it is clear from the plain language of the Asset Protection Policy that the Company views theft of any and all Company property as a breach of honesty and violation of the same Company Policy, without any differentiation as to the seriousness of the infraction or discipline to be imposed.[11]  Indeed, the Company's own labor

---

[10]In support of this proposition, AK Steel cites non-precedential opinions from the courts of appeals for the Third and Sixth Circuits, as well as a non-binding decision from a district court in South Carolina. *See e.g., Johnson v. SEPTA,* 192 F. App'x 147 (3d Cir. 2006) (affirming district court's refusal to allow evidence regarding an alleged comparator where there were material differences in their situations—both troopers were accused of misusing police cars but only plaintiff used car to drop off his daughter at school and made an arrest with a civilian in the car.); *Lawrence v.Veolia Transp. Servs., Inc.,* No. C.A. No. 2:07-2722-MBS, 2009 WL 857394, at *16 (D.S.C. Mar. 30, 2009) (although two incidents, one involving running a personal business during company time and the other involving paying personal bills and running personal errands on company time, could both be classified as "theft of time," court held employer had right to view and treat misconduct of running a side business on company time as a more serious offense warranting more severe discipline.); *Graham v. Best Buy Stores,* 298 F. App'x 487, 495 (6th Cir. 2008) (court recognized that employer could discipline more harshly an employee who tried to purchase merchandise at an improperly low price than an employee who inappropriately attempted to earn additional perks on a legitimate purchase, because even though they violated same general policy prohibiting employee theft, they did not engage in the exact same act.).  However, in each of these cases, the determination of whether the comparators were similarly situated appears to turn on the gravity of the misconduct.  Here, as explained below, no material differences exist in the gravity of the misconduct between the employees charged with theft of time and insurance benefit fraud and Nguyen.

[11]The Handbook specifically provides that stealing includes the commission of "[a]ny action contrary to the company *Asset Protection Policy*."  (Handbook at 76, Ex. 1 to Frisbee Dep., J.A. at Tab 3, ECF No. 41.)

relations representative, Michael Seyler, acknowledged that "theft is theft," "stealing is stealing," and a "falsehood is a falsehood." (Seyler Dep. at 55-57.) Therefore, the Court finds no distinction between Nguyen and the alleged comparators based on the kind of property stolen. *See Cange v. Philadelphia Parking Auth.,* Civ. A. No. 08-3480, 2009 WL 3540784, at *9 (E.D.Pa. Oct. 30, 2009) (where plaintiff, who was terminated for sleeping on duty in cashier's booth, attempted to show she was similarly situated to another employee who was accused of loafing while on duty but not terminated, court concluded their conduct was similar because both violations were punishable by termination, and therefore, refused to preclude the employee as a valid comparator). In addition, the Company's written communications with the employees charged with theft of time supports this finding. (Exhibits attached to Hobaugh Aff., Tab 4 of J.A., ECF No. 41.)

Moreover, the test for determining whether a comparator is proper does not require the misconduct to be identical, but only that the comparator's misconduct be *similar* without such differentiating or mitigating circumstances as would diminish his or her conduct or the employer's treatment of such. Therefore, simply because the asset stolen was different in kind or type does not, without more, eliminate an employee from the list of potential comparators. Indeed, to consider only employees who stole exactly the same property as potential comparators would place too onerous a burden on plaintiffs at the *prima facie* stage of the analysis, contrary to the Supreme Court's holding in *Hicks* and *Burdine*.

Next, the Company submits that the alleged comparators are distinguishable from Nguyen on two other bases: (1) the weight or conclusiveness of its proof of misconduct; and (2) the gravity of the misconduct, i.e., whether the unauthorized taking was intentional or unintentional. The Company contends that Nguyen is the only employee for whom it possessed

conclusive proof of commission of the theft in the form of an admission and documentary evidence, as well as conclusive proof of intent, again based on Nguyen's admission to taking the property. In all of the other theft cases, the Company maintains it possessed only circumstantial evidence of commission of the thefts, did not obtain admissions of wrongdoing from the employees, and lacked proof of intent. The Company maintains, therefore, that it may impose more severe discipline on the employee for whom it possesses greater evidence of guilt.[12] While this last statement may be true generally, here the summary judgment record belies such a finding with regard to Nguyen.

A close examination of the comparators reveals that the Company did possess conclusive evidence of misconduct in several of the other theft cases. In particular, the exhibits attached to Hobaugh's affidavit demonstrate that the Company possessed documentary evidence that JM-2 and JB knowingly received improper payments after their supervisor found their explanations not credible. The evidence further shows that RM and JM-1 submitted false time reports and gave explanations that were simply not credible and incredible, respectively. In addition, when JM-2 and JB were confronted with proof, they admitted to wrongdoing. Moreover, the same direct supervisor (Schmidt) and same labor relations representative at the works management hearings (Harris) concluded that JB, RM and JM-2 committed theft and lied about it. Therefore, the Company's attempt to distinguish these cases based on the weight of the evidence fails to pass muster.

Next, with regard to proof of intent, the Company attempts to argue that Nguyen's admission to stealing the scrap conclusively establishes intent, and thus, distinguishes him from the other theft cases, in which proof of intent was lacking. This argument lacks merit for two

---

[12] In support of this argument, AK Steel relies on *Abel v. Dubberly,* 210 F.3d 1334, 1139 (11th Cir. 2000), and *Shontz v. Rite Aid of Pennsylvania,* 619 F.Supp. 2d 197, 206-07 (W.D.Pa. 2008).

reasons. First, it assumes, incorrectly, that an admission of taking property allegedly belonging to another *ipso facto* proves that the taking was intentional. However, if that were true, it would improperly eliminate the accuser's burden of proof and leave the accused without a defense. Theft, as defined in BLACK'S LAW DICTIONARY at 1324 (5th ed. 1979), is the "obtaining or exerting unauthorized control over property" and "done with *intent* to deprive the owner permanently of the possession, use or benefit of his property[.]" (Emphasis added.) Thus, intent is a separate element which must be proven in addition to proving the taking of another's property. Here Nguyen has adduced sufficient proof that he too lacked intent.

Nguyen has consistently maintained that he believed the scrap belonged to the crane contractor, as he had been approached by one of the contractor's employees and asked if he was interested in buying some of the scrap. (Pl.'s Dep. at 86; Affidavit of Tung Nguyen dated 8/24/09 ("Pl.'s Aff."), ¶3, ECF No. 32-4; Arb. Hrg. Tr. at 118-19, Ex. 16 in Pl.'s App., ECF No. 32-4; Kish Dep. at 11; Crawford Aff., ¶ 4; Weckerly Aff., ¶ 7; Cossitor Aff., ¶¶ 8.) Eventually, after the scrap remained on the floor for several months, Nguyen took it upon himself to clean up the area by removing the scrap from the slab conditioning department without obtaining permission from the Company, with the intent to recycle the scrap. (Arb. Hrg. Tr. at 67-68, 118-120; Pl.'s Dep. at 84.) Nguyen did not believe he needed to obtain permission from the Company because in his mind the property belonged to the contractor, having been approached by the contractor's employee about purchasing the scrap, and subsequently abandoned. (Pl.'s Aff., ¶ 3; Cossitor Aff., ¶ 13.) Plaintiff's belief is supported by the following statement of Brian Cossitor:

> I have reviewed the AK Steel policies relating to the removal of trash, debris and other materials by contractors at the completion of a job, and, in light of Mr. Nguyen's explanation concerning what the contractor's employees told him, and their offer to sell the

> brass to him, I do not believe that the AK Steel theft policies were violated, but rather that Mr. Nguyen had a "guilty conscience" because he felt he should have paid the contractor's employee for the material the contractor left behind.

Cossitor Aff., ¶ 13. Therefore, giving Nguyen the benefit of all reasonable inferences, this evidence is sufficient to show that like the other comparators, he too lacked intent to steal, and therefore, contrary to the Company's argument, intent does not provide a basis upon which to distinguish Nguyen from the other comparators.

Second, when the Court takes away the presumption of intent, sufficient evidence exists in the record from which a jury could reasonably conclude that Nguyen provided the Company with evidence that he lacked intent to steal the property—that at the time he took the scrap, he lacked knowledge that he was stealing the property, as he believed the scrap had been abandoned since it had been laying on the floor of his department for over two months, and prior to that, the crane contractor had offered to sell some of the scrap to him. This information was presented to the Company at the investigatory meeting, as well as at the works management and Step III hearings. Inexplicably, the Company refused to further investigate or review Nguyen's explanation which, if believed, would prove lack of intent, while it did consider such evidence in the other theft cases. It attempts to get around this impropriety by arguing that the employees in the other theft cases are not valid comparators. However, as the evidence demonstrates, this argument is unavailing.

In the end, the Court finds that Plaintiff has identified four valid comparators, i.e., nonmembers of the protected class who were not discharged for similar misconduct without differentiating or mitigating circumstances: JM-1, RM, JB, and JM-2.[13] Like Nguyen, JM-1,

---

[13] The Court finds that the insurance fraud cases are not valid comparators because although Michael Seyler was the labor relations manager in those cases (Hobaugh Aff., ¶ 7), the decision to offer last chance agreements was made by Company officials at corporate headquarters (Seyler Dep. at 64, 66-67); in the case at bar, the labor relations

RM, JB, and JM-2 work in the stab conditioning department of Butler Works (Hobaugh Aff., ¶ 12), were supervised directly by Bill Schmidt (Schmidt Dep. at 25-27), were charged with intentionally stealing Company property[14] (Ex. A to Seyler Aff.), requested works management hearings which were all conducted by the same labor relations representative, Harry Harris (Hobaugh Aff., ¶ 12), proceeded to Step III hearings, all of which were conducted by the same labor relations representative, Michael Seyler (*id.*), and were subject to the same ultimate labor relations decision maker, Rick Winter (*id.*; *see also* Leyland Aff., ¶¶ 4, 6; Gallagher Aff., ¶¶ 5-6).[15]

In addition, each of the four comparators denied that they knowingly obtained pay for time not worked and proffered explanations, which the Company rejected as not credible. Ultimately, however, the Company mitigated its discipline in all four cases, even though it possessed written documentation containing demonstrable proof of instances of theft compounded by lying, and considered all four cases to be "violations of trust such as breach of employee honesty and business ethics involving theft of time", which it deemed serious matters warranting discharge. (Hobaugh Aff., ¶ 13; Exs. attached to Hobaugh Aff., Tab 4 in J.A.) In addition, JM-2 and JB admitted to the misconduct after being presented with proof of the over payments. (Step III Ans. dated 4/24/07 at 2, Grievance No. BU-07-028; Step III Ans. dated

manager at Butler Works and key decision maker was Rick Winter (Hobaugh Aff., ¶ 12). In any event, the Court has no problem finding that the misconduct involved in the insurance fraud cases is not different in kind or magnitude from the other theft cases. As discussed above, it is clear from the Company Asset Protection Policy that the Company views theft of any Company property as a breach of honesty and a violation of the same Company Policy. *See* Note 11, *supra*.

[14] The four comparators were charged with intentionally obtaining pay for time not worked (Ex. A to Seyler Aff.).

[15] A fifth potential comparator, MK (1539400) (hereinafter "MK"), also meets all of these criteria, but a differentiating circumstance exists that distinguishes her from the group, thus precluding her as a valid comparator. MK initially challenged her discharge and filed a grievance, but subsequently withdrew it, even though she provided evidence of her innocence to the Company, after seeking and procuring other employment, because, as a single parent, she could not afford financially to go through the six month grievance process without any income.

4/26/07 at 2, Grievance No. BU-07-036 (Exs. attached to Hobaugh Aff., Tab 4 in J.A.).) Nonetheless, the Company still offered to mitigate their discharges to suspensions. JM-2 and JB proceeded to arbitration only because they refused to accept the mitigated discipline offered by the Company. (Hobaugh Aff., ¶ 13; Leyland Aff., ¶ 7.) At arbitration, their grievances were sustained and they were returned to work with full back pay. (Ex. A to Seyler Aff.; Exs. attached to Hobaugh Aff., Tab 4 in J.A.) RM entered into a confidential settlement with the Company at arbitration, and returned to work. (*Id.*) JM-1 entered into a memorandum of understanding with the Company prior to the arbitration hearing, wherein the disciplinary discharge was converted to a 30-day suspension with partial back pay. (*Id.*) Similar to JM-1, JB, RM, and JM-2, Nguyen initially maintained that he did not steal *Company* property, and after being presented with proof, admitted to taking the scrap brass, but not to taking the scrap with the intent to steal from the Company.

Accordingly, the Court finds this evidence is sufficient to establish an inference of discrimination at the *prima facie* stage of the analysis. Nguyen has shown that he was discharged for stealing Company property in violation of the Company Policy and Asset Protection Policy, while four similarly situated employees from outside the protected class were not discharged for similar conduct which violated the same policies.[16]

---

(Leyland Aff., ¶¶ 4-5; Hobaugh Aff., ¶ 11.)

[16] The Court finds no merit to AK Steel's argument that the list of comparators is under-inclusive. Neither RC (1491900), RD (1540300), MT (1537400), nor MK (1539400) are valid comparators. RC was discharged for stealing a co-worker's wallet and using a stolen credit card from that wallet. However, RC and Nguyen did not share the same labor relations decision maker, as Bill Gonce occupied that position at the time of RC's misconduct, while Rick Winter was the labor relations manager at the time of Nguyen's misconduct. (Hobaugh Aff., ¶¶ 5, 12; Gallagher Aff., ¶15.) In addition, Nguyen has steadfastly maintained he believed the scrap had been abandoned by the contractor and, thus, did not belong to the Company, and he never confessed to stealing Company property (contrary to AK Steel's assertion), while the Company possessed conclusive evidence (video surveillance) of RC using the stolen credit card. RD and MT are not valid comparators because they too were disciplined by a different decision maker—Bill Gonce. MK is not a valid comparator for the reasons set forth above. *See* Note 14, *supra.*

## 2.     Other Evidence of Discrimination[17]

AK Steel submits that Nguyen has failed to adduce any other evidence of discrimination. AK Steel contends there is no merit to Plaintiff's argument that Winter's focus of the investigation on an "Asian male" suggests that the investigation was discriminatory from its inception. In support, AK Steel submits that the facts show the scrap dealer provided a physical description of the seller as an "Asian male, possibly Korean," and a sales receipt bearing Nguyen's signature and a license plate number registered to Nguyen. The Court agrees with AK Steel and finds that Winter's focus on an Asian male was due to information provided by an unbiased third party, and not on an improper discriminatory motive. Accordingly, Plaintiff's reliance on this factor to infer a discriminatory animus is misplaced.

### B.     AK Steel's Legitimate, Non-Discriminatory Reasons For Terminating Nguyen Were Pretextual

In order to rebut the presumption of discrimination, AK Steel has offered legitimate, non-discriminatory reasons for the termination: Nguyen admitted to stealing Company property, selling it for a profit, and then lied about the incident. Thus, the burden now shifts back to Nguyen to show that the legitimate, non-discriminatory reasons articulated by AK Steel are pretextual.

To survive a motion for summary judgment at the third step of the burden shifting analysis, Nguyen must present some evidence, either direct or circumstantial,[18] from which a

---

[17]AK Steel also argues that, to the extent Nguyen attempts to argue that a discriminatory animus can be inferred from derogatory comments and graffiti by his co-workers regarding his ethnicity, such argument is unavailing for several reasons. First, derogatory comments and graffiti made by co-workers regarding Nguyen's ethnicity were not made by decision-makers, and therefore, constitute stray remarks. Second, Nguyen never complained to supervisors about the remarks or graffiti. Third, none of the decision-makers, *i.e.*, Kish, Harris, Seyler, or Winter, had any knowledge of the offensive comments or graffiti. However, Plaintiff has not raised this argument in his responsive brief, and therefore, the Court assumes that he has conceded this point. In any event, the Court agrees with AK Steel that the evidence does not show that any of the Company's labor relations decision makers were aware of the graffiti or derogatory comments, except for possibly Bill Schmidt, but he did not have ultimate decision making authority.

[18] With regard to circumstantial evidence, the court of appeals explained:

jury could reasonably either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994) (citing *Hicks,* 509 U.S. at 510-11; *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 523 (3d Cir. 1992)). The two prongs of the *Fuentes* test are distinct, and therefore, the Court will analyze both prongs to determine whether Nguyen has presented sufficient evidence to withstand summary judgment.

### 1. First Prong of *Fuentes* Test

The first prong of the *Fuentes* test focuses on whether Nguyen has submitted evidence from which a fact-finder could reasonably disbelieve AK Steel's articulated legitimate reasons for discharging him. To satisfy this prong and discredit AK Steel's proffered reasons, Nguyen:

> cannot simply show that his employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Rather, [Nguyen] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Id.* at 765 (quoting *Ezold*, 983 F.2d at 531) (other internal quotations omitted). In other words, Nguyen must prove "not merely that [AK Steel]'s proffered reason was wrong, but that it was so

---

To establish such circumstantial proof, the plaintiff first must present evidence that each of the defendant's reasons is pretextual, viz, each reason was "a post hoc fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). This proof of pretext then may be combined by the factfinder with the evidence used to support the plaintiff's prima facie case of age discrimination, and from this union, the factfinder may reasonably infer that the defendant discriminated against the plaintiff because of his age. *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749.

*Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 136 (3d Cir. 1997) (footnote omitted).

plainly wrong that it cannot have been [AK Steel]'s real reason." *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc). Thus, in analyzing this prong, "'federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination].'" *Id.* (quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir. 1996)).

In this case, AK Steel's proffered reasons for terminating Nguyen were that Nguyen stole Company property, lied about it, and then admitted that he stole Company property. Generally, an employee's admission of misconduct will provide a sufficient foundation for the employer's good faith belief that the employee engaged in the misconduct. *Abel,* 210 F.3d at 1338 (citing *Jones v. Gerwens,* 874 F.2d 1534, 1540-41 (11th Cir. 1989)); *see also Gupta v. Sears, Roebuck & Co.,* Civ. A. No. 07-243, 2009 WL 890585, at *17 n. 5 (W.D.Pa. Mar. 26, 2009) (finding that because plaintiff admitted that she was terminated for misconduct, she failed to offer evidence of pretext under the first prong of *Fuentes*); *Shontz,* 619 F.Supp. 2d at 207-08 (finding plaintiff failed to prove pretext under the first prong of *Fuentes* where he admitted he had violated company policy and failed to offer any evidence of implausibilities or inconsistencies to otherwise discredit the employer's proffered reason).

In the case at bar, Nguyen admitted to taking the scrap brass, which the Company has construed as an admission that he stole "Company" property, in violation of Company policy prohibiting theft. Thus, Nguyen's admission, even though allegedly misconstrued by AK Steel,[19] provides a sufficient foundation for the Company's good faith belief that he engaged in the misconduct, because it is not enough to show merely that AK Steel's decision was wrong or

---

[19] Nguyen maintains that he believed that the scrap belonged the contractor but had been abandoned, and that in taking the scrap without paying for it, he stole it from the crane contractor, not AK Steel.

mistaken. *Fuentes,* 32 F.3d at 765. Accordingly, to show pretext under the first prong of *Fuentes,* Nguyen must come forward with other evidence to show that the Company's reasons for terminating him are so plainly wrong or implausible that they cannot be the real reasons.

Initially, AK Steel submits that Nguyen cannot prove pretext under the first prong of Fuentes because he has offered no evidence (1) to contradict or otherwise controvert the Company's articulated reasons, or (2) to show the Company has given inconsistent or contradictory explanations for terminating his employment.[20] AK Steel further submits that it is not implausible that it would terminate Nguyen for his admitted theft. Stealing is explicitly prohibited by Company policies and therefore Nguyen cannot possibly establish that it made up its reasons for terminating his employment. Even if Nguyen could show he was innocent (which Defendant submits is impossible given his admission and Company policies that prohibit removal of material regardless of who owns it), AK Steel submits that such evidence cannot assist him in proving pretext, because the relevant issue is not whether the Company's reasons are factually correct, but whether they are honest. *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 283 (3d Cir. 2001); *Kariotis v. Navistar Int'l Transp. Corp.,* 131 F.3d 672, 677 (7th Cir. 1997). Therefore, in order to succeed at this stage, Defendant contends Nguyen must prove that it lied when it declared he was terminated for stealing Company property. The Court disagrees with Defendant's assessment of the record evidence and, for the reasons set forth below, finds that Plaintiff has met his burden.

---

[20] AK Steel also argues that Nguyen cannot establish pretext by personally disagreeing with its assessment of the severity of his misconduct based on the value of the property stolen, or by arguing that he is entitled to leniency. Although the Court does not perceive Nguyen to be predicating his pretext argument on these two factors, the Court agrees that neither of these factors is dispositive of whether Plaintiff has met his burden of showing pretext. *Keller,* 130 F.3d at 1109.

The first indicia of weakness and/or implausibility asserted by Nguyen consists of the record evidence establishing that he never admitted to stealing Company property prior to his cross-examination at the arbitration hearing. Therefore, Nguyen submits that the Company's reliance on his so-called admission as the basis for its decision to discharge him prior to the arbitration hearing is completely unfounded. In response, the Company argues that Nguyen admitted he lied when he claimed he purchased the brass from a contractor. (Def.'s App., Ex. O at 127.) Thus, the Company submits that Nguyen's attempt to fault the Company for not following up on his lies is irrelevant to the veracity of the Company's articulated reasons for terminating him. (Def.'s Resp. to Pl.'s Stmt. of Add'l Facts, ¶152, ECF No. 37.) The Court disagrees with Defendant.

Although the Court recognizes that an inference of discrimination cannot be inferred simply from a wrong or mistaken business decision, *Abramson,* 260 F.3d at 283, here Nguyen has presented sufficient evidence to show that a reasonable jury could rationally find the Company's explanation for discharging him—its alleged reliance on his so-called admission—unworthy of credence. At the time of issuance of its notice of intent to discharge, Nguyen had not yet admitted to taking the scrap. The day after the investigatory meeting, however, Nguyen contacted his union representative, and advised him that he had taken the scrap after the contractor had offered to sell it to him, but without paying the contractor for it, and he felt guilty about stealing the scrap from the contractor. (Pl.'s Aff., ¶ 3; Arb. Hrg. Tr. at 127-28; Cossitor Aff., ¶¶ 8, 13.)[21] Even after Nguyen came forward to explain his actions, the Company still did not possess an admission from Nguyen to stealing *Company* property. Rather, the Company

---

[21]In addition, Nguyen explained that it was his remorse over taking scrap from the contractor without paying for it that motivated him to apologize to his co-workers and his supervisor, Bill Schmidt (Arb. Hrg. Tr. at 128), and to admit to taking the scrap at the works management and Step III hearings, not on a belief that he stole from the *Company* (Pl.'s Aff., ¶ 3; Arb. Hrg. Tr. at 127-28; Cossitor Aff., ¶¶ 8, 13).

possessed information which, if verified, could confirm Nguyen's belief that the property he took once belonged to the crane contractor and had been abandoned, and thus, the taking of the brass was not a theft at all. In addition, throughout the works management hearing, Step III hearing, and grievance process, the record shows that Nguyen did not admit to stealing *Company* property at any time prior to his cross-examination at the arbitration hearing. (Crawford Aff., ¶¶ 3, 5; Weckerly Aff., ¶¶ 3-7; Cossitor Aff., ¶7, 9.) Yet, AK Steel continued to proffer Nguyen's admission to stealing Company property as the basis for affirming his discharge. This evidence, when considered together with the other evidence of pretext delineated below, is sufficient to raise a material issue of fact with regard to the Company's motive for discharging Nguyen.

Moreover, even though Nguyen admitted that he lied when he denied taking the scrap at the investigatory meeting, he provided an explanation the very next day for why he initially denied taking the scrap. There is no evidence in the record to suggest that Nguyen's explanation was false, and indeed, that is a credibility determination that a jury must decide. In any event, the record also shows that some of the comparators were also suspected of lying but yet that did not prevent the Company from following up and conducting further review to determine their culpability.

Winter's refusal to consider Nguyen's evidence of lack of intent when Winter considered intent an important, if not the deciding factor, in offering mitigated discipline to the comparators who were also accused of theft, casts doubt on the Company's proffered reasons and thus raises at least an inference that the Company investigated Nguyen's alleged misconduct differently based on his national origin. Although an honest, non-discriminatory reason for discharge, even though based on an improper or inadequate investigation, will not, alone, suffice to show pretext, where the plaintiff comes forward with evidence to show the company investigated him

differently because of his national origin, an inference of discrimination can be drawn. *See Kariotis,* 131 F.3d at 677 (declining to find evidence of pretext where plaintiff's main argument was that the company was careless in not checking its facts before terminating her because even if the company was careless and its decision was wrong, she failed to present any evidence that the company approached her case differently than others). Here, evidence exists to show that the Company did conduct further review of the culpability of the comparators in ultimately determining to mitigate the discipline from discharge to suspension, while Nguyen's discharge determination was issued the day after the investigatory interview, without any further investigation or review. (Hasty Dep. at 37; Winter Dep. at 37.)

Compounding the Company's questionable motivation in relying on Nguyen's so called admission and alleged disparate treatment in investigating Plaintiff's explanation for taking the scrap is Nguyen's second asserted indicia of weakness/implausibility—Winter's alleged fabrication of a two-part test to justify the Company's disciplinary action towards Nguyen. During his deposition on May 5, 2009, Winter stated that he applies a two-part test at each step of the process—investigatory hearing, works management hearing, Step III, Step IV, and arbitration—which asks (1) was the Company convinced that an offense occurred, and (2) could it be proven to a third party. (Winter Dep. at 43-45.)

The record evidence raises substantial doubt as to whether such two-part test was actually being applied by Winter and his subordinates, from February 2007 to May 2009, or whether, in fact, it even existed at all. In Arbitrator Witt's final award in another grievance against the Company (case no. BU-07-217), issued on February 23, 2009 or approximately two months before Winter's May 5, 2009 deposition, she specifically found the Company was wrong to refuse to consider evidence of innocence proffered *after* discipline was imposed, even if

developed as late as the arbitration hearing. (Hobaugh Aff., ¶ 18 & Ex. C thereto at 5-6; Affidavit of William N. Henry, Jr. dated 9/25/09 ("Henry Aff."), ¶ 5 & Ex. B thereto at 5-6.)[22] In case no. BU-07-217, Arbitrator Witt rejected Seyler's conclusion in the Step III Answer dated January 30, 2008 that his review was limited to the "information available at the time the discipline was issued." (Step III Answer dated 1/30/08, case no. BU-07-217, Ex. B to Hobaugh Aff. at 2; Ex. A to Henry Aff. at 2.)[23] Moreover, in the case at bar, neither Harris, who conducted the works management hearing, nor Seyler, who conducted the Step III hearing, applied such a two-part test to Nguyen's case, and in fact, Harris was not aware of such test prior to Winter's testimony given at his deposition on May 5, 2009. (Harris Aff., ¶ 4.) Likewise, none of the union representatives had heard of such two-part test before Winter's deposition. (Leyland Aff., ¶¶ 11, 13; Henry Aff., ¶¶ 6-7.)

The Company attempts to downplay Winter's testimony regarding the two-part test by arguing that Winter was merely providing a pragmatic description of the process and considerations relevant to issuing employee discipline and, if applicable, resolving disputes challenging such discipline. Moreover, AK Steel contends that Winter provided this explanation in response to questions at his deposition seeking to elicit a description of how the Company goes about deciding on an appropriate courts of action in disciplinary cases. In fact, Winter's two-part test was recited in response to questions regarding Policy # 4.00, and whether corporate officials have the power under that policy to override the decision at the plant level to

---

[22] The exhibits to the Hobaugh and Henry affidavits were filed under seal and are contained in the Joint Appendix of Confidential Documents Filed Under Seal (ECF No. 41) at Tabs 4 and 5, respectively.

[23] *See* Note 22, *supra.*

discharge an employee. In particular, Winter was asked what constitutes extenuating circumstances under Policy # 4.00, and in response to that question, Winter articulated the two-part test. (Winter Dep. at 43-44.)

Defendant completely fails to address Plaintiff's evidence regarding Arbitrator Witt's finding in case no. BU-07-217, the timing of these events, and the fact that Winter's two-part test is not supported by either management or the union. In light of this evidence, the Court finds the Company's argument lacking in merit and concludes that a jury could reasonably infer the Company's explanation regarding the two-part test is unworthy of credence.

The next indicia of weakness and/or implausibility is Winter's explanation for not offering Plaintiff a last chance agreement. Winter was asked on two separate occasions to consider a last chance agreement for Nguyen—once by Brian Cossitor in July 2007, a couple of days prior to the arbitration hearing, and again by Hank Leyland after the arbitration hearing, but before the arbitrator issued her decision. In discussing his request for a last chance agreement with Winter, Cossitor contends Winter compared Nguyen to Cossitor, who was well known throughout the plant due to Cossitor's position as Vice President of the union, which Cossitor construed to mean that because of Nguyen's national origin, he was highly visible. (Cossitor Dep. at 17-19.) Because Nguyen was "widely known," Winter told Cossitor could not offer Nguyen a last chance agreement; Winter explained that he was not worried about Nguyen, but was "worried about the 1400 other people." (*Id.*) Based on this discussion, Cossitor believed that Nguyen's national origin was an issue in Winter's declining to offer him a last chance agreement. (*Id.*)

In response, AK Steel contends that Winter's comments are innocuous on their face. Moreover, AK Steel submits that Cossitor admits certain types of misconduct are far more

visible amongst employees, such as drug/alcohol violations, fighting and theft. In this case, AK Steel contends Nguyen apologized to his co-workers and, consequently, he was even more visible because he admitted to his co-workers that he stole.

While AK Steel's suppositions have some superficial appeal, they are based mostly on conjecture, not evidence. Cossitor's acknowledgement that certain types of misconduct create heightened visibility is, at best, a generalized comment and does not specifically address the visibility of Plaintiff's case in particular. Moreover, this generalized comment is not sufficient where, as here, Nguyen has presented specific evidence to show that *he* was not well known outside of the slab conditioning department where he worked. For example, Gallagher confirmed that the department where Nguyen worked was located in an isolated part of the plant, in which only a dozen employees worked at a given time. (Gallagher Aff., ¶ 16.) In addition, Leyland stated he was not aware of any particular notice being paid to Nguyen's case by bargaining unit personnel any more than any other case. (Leyland Aff. ¶ 12.) In addition, Hobaugh stated that Nguyen's case was not widely known outside the slab conditioning department where he worked and was not, to his knowledge, the subject of much discussion or notoriety outside of the union officials working on his case. (Hobaugh Aff., ¶ 15.)

As to Hank Leyland's subsequent request, on Nguyen's behalf, for a last chance agreement, Winter stated he denied the request based on his "feeling" that Nguyen's case was being closely watched by other hourly bargaining unit employees. (Winter Dep. at 62-64.) When asked how he came to this "feeling," Winter responded that in the past, he had received an anonymous letter describing an incident of theft involving another employee, and hourly bargaining unit employees have made private comments off the record to him about discipline imposed on certain cases. (*Id.* at 65.) Based on these communications, Winter claims he had a

"feeling" people were looking at Nguyen's case because it was a theft case. (*Id.* at 65-66.) But when asked if he ever received any anonymous letters/communications or off the record comments from anyone specifically regarding Nguyen's case, Winter responded in the negative. (*Id.* at 65.) The statements of Hank Leyland and Keith Hobaugh, mentioned above, also cast doubt upon Winter's so-called "feeling." Accordingly, given the lack of an evidentiary basis for Winter's "feeling," as well as the evidence proffered by Plaintiff from Cossitor, Gallagher, Leyland and Hobaugh, a jury could reasonably find that Winter's explanation for declining to offer Nguyen a last chance agreement is unworthy of credence.

Other evidence proffered by Nguyen to show weakness in the Company's articulated reasons is the alleged violation of Corporate Policy # 4.00, which states that where dishonesty results in discharge, the results of the investigation and any consequent disciplinary action will be reported to various enumerated officers of the corporation, yet Winter did not make any such report with regard to Nguyen. In response, AK Steel argues that Nguyen has failed to establish he was treated differently than similarly situated comparators with respect to the application of Corporate Policy # 4.00. While that may be relevant for purposes of showing pretext under the second prong of *Fuentes,* AK Steel's argument ignores the relevance of its practice with regard to the first prong of *Fuentes.* Thus, while Winter's failure to notify corporate headquarters is likely insufficient alone to render the Company's proffered reasons unworthy of credence, when considered together with the other indicia of implausibility, the totality of the pretext evidence is sufficient for the factfinders to reasonably infer that the Company's proffered reasons are unworthy of credence.

As AK Steel suggests, it is not implausible that an employer would terminate an employee for admitted theft of company property, but that conclusion is based on proof of

culpability.  However, as explained above, that is not the case presented here.  Rather, AK Steel possessed and ignored the evidence presented by Nguyen demonstrating his lack of culpability. Under these circumstances, and based on the weaknesses identified above, the Court finds that a reasonable jury could find that it is implausible that AK Steel terminated Nguyen for the proffered legitimate, non-discriminatory reasons.  Accordingly, the Court finds that Nguyen has presented sufficient evidence of pretext under the first prong of *Fuentes* from which a "'reasonable factfinder could rationally find [the Company's proffered reasons] unworthy of credence,' and hence infer 'that [AK Steel] did not act for [the asserted] nondiscriminatory reasons."  *Fuentes,* 32 F.3d at 765 (quoting *Ezold,* 983 F.2d at 531).

## 2.    Second Prong of *Fuentes* Test

Under the second prong of the *Fuentes* test, Nguyen must identify evidence in the summary judgment record that "'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause'" of his discharge.  *Keller,* 130 F.3d at 1111 (quoting *Fuentes,* 32 F.3d at 762).  Nguyen can meet this burden by proving that AK Steel either: (1) "previously discriminated against [him]," (2) "discriminated against other persons within the [P]laintiff's protected class or within another protected class," or (3) treated similarly situated individuals outside the protected class more favorably than Plaintiff. *Simpson,* 142 F.3d at 645 (citing *Fuentes,* 32 F.3d at 765).

In support of his claim that the Company's legitimate non-discriminatory reasons for his discharge are merely pretext, Nguyen has proffered evidence that several individuals outside of his protected class were treated more favorably for similar policy violations.  As the Chief Judge of this district so aptly noted in *Brooks v. USX Corp.*:

> Plaintiff's burden at the pretext stage of the analysis is to show
> with a level of specificity that the comparators were in fact treated

> more favorably. *Simpson*, 142 F.3d at 646. When establishing
> pretext, Plaintiff's claim cannot rest on the favorable treatment of a
> single non-class member, and Plaintiff cannot pick and choose a
> person perceived to be a valid comparator while ignoring
> comparators who were treated the same or less favorably than him.
> Id. at 646-47. Finally, when evaluating comparators, the focus is
> on the particular criteria identified by the employer as the reason
> for the adverse action. Id. at 647.

2006 WL 2547342, at *8. Thus, in determining whether the comparators were, in fact, treated more favorably than Nguyen, the Court begins its analysis by focusing on the particular criteria identified by AK Steel for discharging Nguyen.

The misconduct for which Nguyen was discharged is theft of Company property in violation of the Company's Asset Protection Policy. In determining the appropriate discipline in such cases, AK Steel claims it considers whether the employee *knowingly* engaged in the misconduct and the strength of the evidence, direct or circumstantial, showing that the employee intended to steal Company property. In the case at bar, AK Steel has maintained that it based its decision to discharge Nguyen on what it contends is objective and conclusive evidence of Nguyen's theft of Company property—Nguyen's own admission that he stole the brass scrap. According to AK Steel, Nguyen unquestionably knew that he was not permitted to remove material from the facility without supervisory approval. Consequently, AK Steel maintains this conclusive proof of Nguyen's intent distinguishes his case from the other theft cases in which agreed to mitigate discipline.

To this end, Defendant posits that Nguyen's attempt to show pretext through examples of similarly situated employees treated more favorably must fail, as he has not identified a single instance where the Company declined to discharge an employee who admittedly stole and sold Company property. According to AK Steel, it is immaterial that the cases asserted by Plaintiff as valid comparators, broadly speaking, involved allegations of various misconduct falling under

the same policy. Rather, Defendant contends Plaintiff must demonstrate that employees from outside the protected class, who committed the same misconduct and were similarly situated in all other material respects, including the weight of the evidence against them, were treated differently, which he has not and cannot do. According to AK Steel, evidence showing that some employees admitted wrongdoing simply fails to establish that the employees were similarly situated to Nguyen, who admitted to knowingly taking crane parts from the plant, as opposed to the putative comparators who submitted inaccurate information on an insurance form. Therefore, the Company maintains, evidence of intent, the critical element necessary to distinguish theft from mistake, did not exist in the other cases. On the other hand, the Company submits, the uncontroverted evidence shows that in the only instance where it had conclusive evidence of theft (video surveillance of an employee using a stolen credit card), the employee was discharged.

The Court rejects AK Steel's argument because, as this Court concluded above, the Company possessed conclusive proof of theft on the part of the comparators, and yet, offered to, and did, mitigate discipline with regard to these other, similarly situated, employees. Moreover, several of the employees charged with insurance benefit fraud admitted wrongdoing after being presented with documented evidence of wrongdoing (Ihlenfeld Aff., ¶10), and yet were given last chance agreements, unlike Plaintiff, who was twice refused a last chance agreement by the Company. The Company's handling of the insurance benefit fraud cases, even though not true comparators (since the ultimate decision to offer last chance agreements came from corporate headquarters), does provide additional evidence that the Company's basis for distinguishing the other comparators from Nguyen—that he was the only one who admitted wrongdoing—is suspect.

As to Defendant's last point concerning the only true comparator who was also discharged, RC, the Court finds Defendant's argument unavailing. A reasonable jury could find that in taking scrap brass, Nguyen believed the property belonged to the contractor, but had been abandoned, and therefore, he lacked the intent necessary to constitute a theft. In any event, Nguyen's conduct, lacking such intent, can hardly be likened to a theft of an employee's wallet, which was clearly intentional. And, as discussed above, the decision maker in RC's case was Bill Gonce, Rick Winter's predecessor. *See* Note 16, *supra.* Employees are not considered comparable where the discipline was imposed by different decision makers. *Ogden,* 226 F.Supp. 2d at 603; *Peirick,* 510 F.3d at 688. Therefore, contrary to AK Steel's assertion, Nguyen did not pick and choose his comparators; rather, the four comparators whose discharges were not mitigated, RC, RD, MT and MK, are materially distinguishable, and thus, are not true comparators. *See* Note 16, *supra.*

Finally, AK Steel argues that Nguyen cannot prove pretext by submitting an affidavit in support of his opposition to summary judgment that contradicts his sworn testimony at the arbitration hearing. Defendant's argument, in this regard, is two-fold: First, the Court should disregard Nguyen's affidavit based on the sham affidavit doctrine; and second, even if Nguyen's affidavit is allowed to stand, he cannot create a triable issue of fact by now arguing that although he took the brass, he did not "steal it," but rather, the brass had been abandoned by contractors and no longer belonged to the Company. Such evidence, AK Steel contends, even if allowed, shows only that it erroneously determined that Nguyen stole Company property, and therefore, does not prove pretext. To the contrary, the Court finds such evidence demonstrates Nguyen's lack of intent and thus is material to establishing that Nguyen is similarly situated to the four comparators who stole time but were not discharged.

The relevant portion of Nguyen's affidavit provides:

> During my testimony in the arbitration hearing I testified that I stole the property, and that the property belonged to the Company. Although I testified that I stole <u>company</u> property, I never believed that the brass I took belonged to the Company. The reason that I testified that I stole company property is because I had been told, repeatedly, by the company officials who confronted me, that I had stolen company property and I decided that if the Company insisted I stole its property, I would agree and throw myself on its mercy.

Pl.'s Aff., ¶7.

AK Steel correctly observes that the sham affidavit doctrine, pursuant to which a district court may disregard an offsetting affidavit submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony without explaining the contradiction, has been recognized in this circuit. *In re CitX Corp., Inc.,* 448 F.3d 672, 679 (3d Cir. 2006) (citing *Baer v. Chase,* 392 F.3d 609, 623-24 (3d Cir. 2004)). However, a district court is not required to disregard the affidavit in all cases merely because there is a discrepancy between the affidavit and the prior deposition testimony. *Baer,* 392 F.3d at 624 (citations omitted). If the plaintiff provides a legitimate reason for the inconsistency, such as "'[w]here the witness was confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material issue of fact.'" *Id.* at 625 (quoting *Martin v. Merrell Dow Pharm., Inc.,* 851 F.2d 703, 705 (3d Cir. 1998)). Also, courts have generally refused to disregard the affidavit where independent evidence exists in the record to bolster an otherwise questionable affidavit. *Id.* (citing *Bushnell v. Wackenhut Int'l, Inc.,* 731 F.Supp. 1574, 1578 (S.D.Fla. 1990) (deposition testimony of third party can provide corroborating evidence as to substance of subsequent affidavit); *Palazzo ex rel. Delmage v. Corio,* 232 F.3d 38, 43-44 (2d Cir. 2000) (documentary evidence introduced to

support contradictory statements in subsequent affidavit); *Delaney v. Deere & Co.,* 219 F.3d 1195, 1196 n.1 (10th Cir. 2000) (good faith basis for inconsistency may be established by new evidence)).

Applying this law to the case at bar, the Court declines AK Steel's invitation to disregard Nguyen's affidavit based on the sham affidavit doctrine. Whether Nguyen admitted to stealing Company property, *i.e.,* property that he knew belonged to AK Steel, was at issue prior to Nguyen's submission of his affidavit. Indeed, Nguyen has maintained all along that he believed the scrap belonged to the crane contractor and was subsequently abandoned, and thus, has not asserted that fact for the first time in his affidavit. (Crawford Aff., ¶4; Weckerly Aff., ¶7; Cossitor Aff., ¶8; Nguyen Dep. at 83-85, 106-08.) Thus, this is not a case where a party has submitted a self-serving affidavit to create an issue of fact at the summary judgment stage, which practice is clearly improper.[24] But rather, in the Court's view, Plaintiff's affidavit is proffered to supplement and clarify a position he has maintained since February 2007, when he was confronted about the brass scrap at issue. *See* Cossitor Aff., ¶¶ 9-13. In addition, as noted above, the record contains other evidence to support Nguyen's position; he does not rely merely on his affidavit to create an issue of fact. Finally, Plaintiff's conflicting testimony and the reasons

---

[24] While the Court is cognizant of the fact that in deciding a motion for summary judgment "it is not the role of the trial judge 'to weigh the evidence and determine the truth of the matter," neither may a plaintiff "manufacture an issue of disputed fact by relying 'upon mere allegations, general denials, or [ ] vague statements.'" *Stiles v. Synchronoss Tech., Inc.*, Civ. A. No. 07-CV-1923, 2008 WL 3540483, *3 (E.D.Pa. Aug. 12, 2008) (quoting *Anderson.*, 477 U.S. at 250, and *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir. 1991)). "[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.,* 560 F.3d 156, 161 (3d Cir. 2009) (citing *Blair v. Scott Specialty Gases,* 283 F.3d 595, 608 (3d Cir. 2002); *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985))**.**

This is not a situation where Nguyen is attempting to rely merely on his own self-serving assertions to create a material issue of fact. Rather, substantial evidence submitted by Nguyen, in addition to his affidavit, supports his position. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [plaintiffs'] position will be insufficient; there must be evidence on which the jury could reasonably find for the [plaintiffs]"). *See also Nationwide Mut. Ins. Co. v. Roth,* 252 F. App'x 505, 508 (3d Cir. 2007) (holding plaintiff could not rely on his self-serving affidavit to avoid summary judgment where the overwhelming documentary record evidence supported a contrary conclusion) (citing *Blair,* 283 F.3d at 608) (other citation omitted).

therefor require a credibility determination, which should be made by the triers of fact, not the Court.

In summary, the proper inquiry here is not whether the Company wrongfully concluded that Nguyen stole Company property, but rather, whether the Company's decisions to terminate Nguyen and, subsequently, to refuse to mitigate the discipline, were based on a discriminatory motive. After reviewing the voluminous documents in the summary judgment record, the Court concludes that Nguyen has presented sufficient evidence to raise material issues of fact as to the legitimacy of the Company's decision-making process on two fronts:    (1) whether the Company's proffered reasons are unworthy of credence, and (2) whether the Company treated Nguyen less favorably than similarly situated employees outside the protected group.   Thus, as the Supreme Court explained in *Reeves v. Sanderson Plumbing Products, Inc.*:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination."

530 U.S. 133, 147 (2000) (quoting *Hicks,* 509 U.S. at 511).  The Supreme Court went on to find:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); *see also Wilson v. United States*, 162 U.S. 613, 620-621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); 2 J. Wigmore, Evidence § 278(2), p. 133 (J. Chadbourn rev. 1979). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. *Cf. Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting

an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id.* at 147-48. In the case at bar, Plaintiff has presented sufficient evidence from which a reasonable jury could find that the Company's proffered reasons are false, and thus, infer the ultimate fact that the Company unlawfully discriminated against Nguyen.


IV.    **CONCLUSION**

For the reasons set forth above, the Court finds that material issues of fact exist precluding summary judgment. Therefore, the Court will deny Defendant's Motion for Summary Judgment.

An appropriate order will follow.

By the Court:

_____
LISA PUPO LENIHAN
United States Magistrate Judge

Dated: August 25, 2010

cc:    All Counsel of Record
       *Via Electronic Mail*